# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

MICHAEL J. PETRUCELLI and
MARGARET C. PETRUCELLI,

                Plaintiffs,

   v.

JEANNINE J. PALMER,

                Defendant.

3:07-CV-01783 (CSH)

## MEMORANDUM OF DECISION

HAIGHT, Senior District Judge:

## I.    PRELIMINARY

This is a case of mistake in a real estate transaction.  Plaintiffs Michael and Margaret Petrucelli mistakenly believed that a weekend home they were buying from defendant Jeannine Palmer was fully contained within the boundaries of its plot, and that there were no problems with encroachment onto adjacent properties.

The mistake may or may not have been mutual: defendant Palmer claims she did not know that the property had any such problems, but plaintiffs question her credibility.  The mistake also might or might not have been caused by Palmer's representations on a schedule attached to the contract for sale — the Petrucellis say they relied on this form, but Palmer disputes that claim.  But these disputes, while important, are not dispositive.

It is undisputed that within weeks of the closing, a survey revealed to the Petrucellis, for the first time, that a corner of the house itself as well as most or all of the septic system are located beyond the rear boundary of the property, on the strip of shoreline that surrounds the lake and is

controlled by a power company.[1]

Once this fact was revealed, it imposed considerable restraints on what the Petrucellis could do with their newly acquired property. They promptly demanded a rescission of the transaction. Defendant refused, and this lawsuit followed. Plaintiffs invoke the Court's diversity jurisdiction.

Discovery is complete, and the parties have cross-moved for summary judgment. The Petrucellis ask the Court to rescind the transaction entirely.[2] Palmer seeks a judgment that any recovery is barred because the mistake was more the fault of the Petrucellis than her own.

In the final analysis, whether Palmer had absolutely no knowledge of the problems or whether she knew everything and lied is not material. Similarly, there is no genuine issue as to whether or not the Petrucellis relied on her representations. For the reasons that follow, the Court concludes that this case is tailor-made for application of the equitable remedy of rescission.

## II.    BACKGROUND

### A.    Jurisdictional Facts

Plaintiffs properly invoke this Court's diversity jurisdiction. The Petrucellis are residents of Riverside, Connecticut, Compl. [doc. #1] ¶ 1, while Palmer "considers her residence in New York as her home," and the only other properties she has ever owned are two condos in Florida and the Premises at issue in this case. Pls.' Local Rule 56(a)(1) Statement [doc. #27] ¶ 75 (citing deposition

---

[1]    The unforeseen encroachment problem arises from the same feature that makes this property attractive: the rear boundary of the property is a piece of shoreline on scenic Candlewood Lake in Connecticut. That lake feeds a hydroelectric dam now operated by a power company called FirstLight.

[2]    Plaintiffs also assert, as part of the equitable remedy of rescission, monetary claims in amounts sufficient to place themselves in the position they were in prior to the transaction, while still arguing that the motion "exclusively requests the remedy of rescission." Pls.'s Reply Mem. [doc. #33] at 2. I address these claims later in this opinion.

transcript); Def.'s Local Rule 56(a)(1) Statement [doc. #25] ¶ 3.[3]  I find that taken as a whole, the record demonstrates that there is complete diversity of citizenship between the plaintiffs and defendant.

The property in controversy was sold to the plaintiffs for $898,000.  Although the remedy sought by plaintiffs — rescission of the contract — is equitable in nature, the Supreme Court has stated that in situations where other equitable or non-pecuniary relief is sought, such as declaratory or injunctive relief, "it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977); *see also DiTolla v. Doral Dental IPA of New York*, 469 F.3d 271, 276 (2d Cir. 2006).  Even in the face of the problems arising from the property's boundary line, the plaintiffs have submitted a conservative assessment showing that the property is worth at least $200,000.  I conclude, therefore, that "the value of the object of the litigation" satisfies the $75,000 amount-in-controversy requirement of 28 U.S.C. § 1332.

### B.    The Real Estate Transaction

The property that changed hands, located at 9 Lakeshore North, New Fairfield, Connecticut

---

[3]    In an Order dated December 10, 2008 [doc. #38], I noted that the Complaint inadequately pled diversity jurisdiction because it alleged only the plaintiffs' *residence* and not their *domicile*, the determinative factor for diversity of citizenship purposes, and that further facts with respect to their citizenship did not "appear with equal distinctiveness in other parts of the record." *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44 (2d Cir. 1996) (quoting *Wolfe v. Hartford Life & Annuity Ins. Co.*, 148 U.S. 389 (1893)). However, I did find that the record taken as a whole was sufficient to demonstrate that Palmer was, at the time of the filing of the Complaint, a domiciliary of either New York or Florida.  For that reason, I instructed the plaintiffs to submit a supplemental affidavit confirming whether, at the time of the filing of the Complaint, they maintained a residence in either New York or Florida.  Since they did not maintain any such residence, *see* Pls.' Aff. of December 12, 2008 [doc. #39-2], I find there to be complete diversity of citizenship in this case.

(the "Premises"), is a small plot of land  measuring 0.109 acres.  It backs up against the shoreline

of Candlewood Lake.  The location of that rear boundary was originally determined based on a fixed

elevation of 440 feet above sea level.[4]  The parties' submissions refer to this line as the "440' contour

line."  I will do so in this opinion.

Palmer put the Premises up for sale.  She received and rejected at least four offers to purchase

the property in 2006 and 2007.  On August 18, 2007, the Petrucellis made an offer of $900,000,

which Palmer decided to accept because it was higher than other offers she had received.

After that offer was accepted, Margaret Petrucelli "hired professionals to conduct a home

inspection, test the domestic water, test the air for radon and test the septic system." [doc. #27] ¶ 11.

Both parties were represented by legal counsel in this transaction.  The Petrucellis were considering

tearing down the existing structure and building a new home in its place.  In anticipation of such a

plan, Mrs. Petrucelli visited the lot on more than one occasion and took measurements there.  The

home itself was also professionally inspected to provide an estimate of how much such work would

cost.  Also prior to the closing, the septic tank was inspected by Dennis Carlson, the owner of A-1

Septic Co.  The Petrucellis also consulted Rich Jackson, the Sanitarian for the Town of New

Fairfield, prior to the closing.

---

[4]      The reason for determining the boundary based on a fixed elevation apparently relates to
the fact that the water level on Candlewood Lake fluctuates based on the usage of a hydroelectric
dam currently operated by licensee FirstLight.  In order to permit the operator of that dam to
control the water level, the Federal Energy Regulatory Commission was given title to all the
shoreline up to that certain elevation. *Cf.* Depo. of Dennis Carlson, Def.'s Local Rule 56(a)(1)
Statement, Ex. J, at 13 [doc. #25 at 98]; *see also Hackett v. J.L.G. Properties, LLC*, 940 A.2d
769, 285 Conn. 498 (Conn. 2008) (describing the history and regulation of Candlewood Lake);
Pls.' Motion for Judicial Notice [doc. #29] (requesting judicial notice of same).

## C.      Knowledge of the Boundary Problem

During the course of these professional inspections — performed by persons who were experienced with properties on Candlewood Lake and who might have known that such properties had problems with encroachment below the 440' contour line — nobody advised the Petrucellis that their property might face similar problems.[5]

───────────────────────

[5]      The closest that Mrs. Petrucelli came to receiving advice on this point appears to have been during the septic inspection by Dennis Carlson:

> Q      Have you ever had any discussions with any homeowners regarding the possible impact of the 440-foot contour line in relation to their septic system?
>
> A      Yes.  I mean, honestly, I'd say -- I can't put on a percentage, but most of them are actually below the 440 line.
>
> Q      Most of the septic systems on waterfont property you found to be below the 440-foot contour line?
>
> A      Yes.
>
> Q      Did you have any discussion with anyone who was present at your inspection [of the premises] about the 440-foot contour line?
>
> A      Yes.
>
> Q      Okay.  And who did you talk to about that issue?
>
> A      Probably Margaret [Petrucelli] and the agents.
>
> Q      And what do you recall about that discussion?
>
> A      I don't know.  I don't want to make anything up.  I just -- there is a 440 line.  I know Margaret wanted to do some renovations to the dwelling.  And I told her about the test work.  And I really have -- it's -- the 440 line -- you know, there was no -- at the time, I don't believe there was an A-2 survey or anything available.  So it was hard to, you know, tell where the 440 line is.  So you know, I just -- I assumed -- or not assumed, but, you know, probably just said let's do test work and determine -- so we can determine, you know, what we can do here, as well as she probably needed an A-2 survey, or had to produce some kind of survey for the health department.

Margaret Petrucelli even visited, at one point, a public records office, where she reviewed the file concerning the property she was acquiring.  But after reviewing the file, she had no new concerns or questions about the configuration of the property.

The uncontroverted testimony is that Margaret Petrucelli knew, prior to the closing, that the 440' contour line determined the rear boundary of her property.  But crucially, she did not know what that line was, or where precisely on the property it was located.  The Petrucellis allege, and Palmer admits, that "[u]pon receipt and review of the Property Survey . . . the plaintiffs were shocked to learn that a portion of the house at the Premises and almost all of the rear yard, including the area where the septic tank and leaching fields are located, are beyond the rear boundary line of the Premises." [doc. #27] ¶ 54; [doc. #30-2] ¶ 54.

Less clear from the record is how much Palmer knew about the location of the 440' contour line or the encroachment problems posed by the rear corner of the house and the septic system.   In her statement of material facts as to which she contends there is no dispute, Palmer alleges:

> 7.    At no time during her period of ownership was Palmer aware of any issues regarding the location of the septic system or how the house was situated on the lot.
>
> 8.    During her period of ownership, she was not aware of ever having a survey done of the property; having it appraised; having any work done that required a building permit; nor having repairs or improvements done to the septic system.
>
> . . .

---

> Q    But do you recall having any discussion with Mrs. Petrucelli about needing a survey?
>
> A    I don't recall, no.

Depo. of Dennis Carlson, Def.'s Local Rule 56(a)(1) Statement, Ex. J, at 14 [doc. #25 at 99]; Depo. of Dennis Carlson, Pls.' Local Rule 56(a)(2) Statement, Ex. N, at 15 [doc. #31-15 at 5].

11.    During her period of ownership, she was not familiar with the concept of the 440' elevation line.

12.    During her period of ownership, Palmer was unaware of anyone else in the area having an issue regarding property boundaries and the septic system.

13.    Palmer's husband had taken care of issues relating to the property.

Def.'s Local Rule 56(a)(1) Statement [doc. #25] at 2-3.

The Petrucellis contest these assertions. They acknowledge that Palmer "testified during her deposition on May 29, 2008, that she was not aware of any issues regarding the encroachments at the premises," but seek to discredit this testimony by pointing to other perceived inconsistencies between what Palmer has said and written with respect to her knowledge of the boundaries at the Premises. *See* Pls.' Local Rule 56(a)(2) Statement [doc. #31] ¶¶ 7-13, at 1-4.

This dispute may be genuine, but it is not material under the governing law. The result is the same, whether Palmer was telling the truth in her deposition or not.

## III.    DISCUSSION

### A.    Standard of Review

On their cross-motions, both parties argue that discovery has not uncovered any genuine issues of material fact, and that the case is ripe for summary judgment.

Rule 56(c) of the Federal Rules of Civil Procedure provides that a moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2008). "A fact is material when it might affect the outcome of the suit under governing law. An issue of fact is genuine if the evidence is

such that a reasonable jury could [have] return[ed] a verdict for the [appellant]." *Miner v. Clinton County*, 541 F.3d 464, 471 (2d Cir. 2008) (brackets in original) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)). In this diversity action, the governing law is that of the state of Connecticut. "[U]nless the nonmoving party offers some hard evidence showing that its version of the events is not wholly fanciful, summary judgment is granted to the moving party." *Id.* (quoting *McCarthy*)).

**B.     Analysis**

Both parties have identified areas of factual dispute. For example, the Petrucellis contend, and Palmer denies, that "the harm they have suffered cannot reasonably be calculated in money damages." Pls.' Local Rule 56(a)(1) Statement [doc. #27] ¶ 70. Similarly, Palmer contends that "[n]o governmental official has threatened enforcement action against use of the property," Def.'s Local Rule 56(a)(1) Statement [doc. #25] ¶ 33, "[m]any Candlewood Lake waterfront properties have septic systems located beneath the 440' contour line," *id.* ¶ 40, and "[a] new septic system can be installed on the lot for the existing house and a permit can be obtained for it, with waivers and variances," *id.* ¶ 43, all of which plaintiffs deny. *See* Pls.' Local Rule 56(a)(2) Statement [doc. #31] ¶¶ 33, 40, 43.

There may be genuine issues of fact with respect to these matters. However, in the view I take of the case, these issues are not material, since they do not affect the ultimate question of the defendant's liability, under either tort or breach-of-contract theories.

The Petrucellis also allege that they relied on Palmer's misrepresentations, described *infra*, and that "[h]ad the plaintiffs known of the encroachments before they signed the Contract, they would not have agreed to purchase the Premises," Pls.' Local Rule 56(a)(1) Statement [doc. #27] ¶

61.  This allegation is certainly material — without such reliance, the Petrucellis cannot establish a

key element of their claims — but for reasons described *infra*, I find that any dispute over such

reliance is not genuine.

Defendant Palmer has also alleged that the contract in this case is ambiguous.  If that were

true, then the case would not be suitable for a disposition on summary judgment on at least the claim

for breach of contract.  *See Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)

("[G]enerally . . . a motion for summary judgment may be granted in a contract dispute only when

the contractual language on which the moving party's case rests is found to be wholly unambiguous

and to convey a definite meaning. . . . Ambiguity here is defined in terms of whether a reasonably

intelligent person viewing the contract objectively could interpret the language in more than one

way.").  But since I conclude that the contract is not ambiguous, decision on these cross-motions for

summary judgment is appropriate.

### C.    Written Representations

I begin with the transaction documents.  The Petrucellis argue that they contain unambiguous

representations that are demonstrably inaccurate.

The most salient of these representations appear in Schedule B to the contract of sale.

Schedule B's prefatory paragraph reads: "Seller has no reasonable cause to doubt the accuracy of *and*

*hereby represents, in order to induce Buyer to enter into this Contract, that . . . the following*

*statements are accurate*: . . . ."  Pls.' Local Rule 56(a)(1) Statement, Ex. Q. [doc. #27-19] at 13

(emphasis added).[6]  A number of lettered paragraphs follow.  Paragraph D provides in part: "Any

---

[6]      More complete excerpts of these documents are included as an appendix to this opinion,
to provide the reader with some omitted phrases and more context for the relevant portions of the
documents.

buildings, appurtenances, systems and driveways servicing said Premises are entirely within the boundary lines of said Premises."  Paragraph K provides in part: "The *Seller represents* that the Premises are serviced by a septic tank and leaching fields located entirely within the lot lines of the Premises, [and] that the tank and fields serve no other Premises."  *Id.* at 14 (emphasis added).

Palmer concedes that the statements in paragraphs D and K of Schedule B were inaccurate. Given the post-sale survey, she must do so.  But Palmer argues that any representations she made were qualified by Schedule B's prefatory paragraph, a construction the Petrucellis reject. Specifically, the parties disagree over the importance of the introductory phrase with which Schedule B begins: "Seller has no reasonable cause to doubt the accuracy of . . . ."  *Id.* at 13.

Plaintiffs assert that Schedule B's prefatory paragraph makes two representations: first, that Palmer had no reasonable cause to doubt the accuracy of the subsequent statements; and second, independently, that those statements were affirmatively true.  Palmer reads it differently.  According to her, the introductory phrase disclaims or limits everything that follows in Schedule B.  In other words, Palmer argues that the disputed language makes only the first representation of the two representations that the Petrucellis identify, namely, that Palmer had no reason to doubt the accuracy of the statements concerning the Premises which appear in paragraphs D and K of Schedule B.

In the alternative, Palmer argues that even if her interpretation is not clearly correct, then this prefatory language is ambiguous. Palmer also asks that any ambiguities in the Contract be construed against the party that drafted the language in dispute.  In the case of Schedule B, that would require me to construe any ambiguities in Schedule B against the Petrucellis, since it was their attorney who, upon examining the contract drafted by Palmer's attorney, drafted Schedule B and advised the Petrucellis to insist upon its inclusion in the contract of sale.

### 1.    The Prefatory Paragraph to Schedule B Is Not Ambiguous

The Connecticut Supreme Court has provided clear and comprehensive guidance when

examining a contract for existence of an ambiguity:

> In determining whether a contract is ambiguous, the words of the
> contract must be given their natural and ordinary meaning. A contract
> is unambiguous when its language is clear and conveys a definite and
> precise intent.  The court will not torture words to impart ambiguity
> where ordinary meaning leaves no room for ambiguity.  Moreover,
> the mere fact that the parties advance different interpretations of the
> language in question does not necessitate a conclusion that the
> language is ambiguous.   Furthermore, a presumption that the
> language used is definitive arises when, as in the present case, the
> contract at issue is between sophisticated parties and is commercial
> in nature.
>
> In contrast, a contract is ambiguous if the intent of the parties is not
> clear and certain from the language of the contract itself.   [A]ny
> ambiguity in a contract must emanate from the language used by the
> parties.   The contract must be viewed in its entirety, with each
> provision read in light of the other provisions; and every provision
> must be given effect if it is possible to do so.   In addition, [w]hen
> there are multiple writings regarding the same transaction, the
> writings should be considered together in construing the contract.  If
> the language of the contract is susceptible to more than one
> reasonable interpretation, the contract is ambiguous.

*United Illuminating Co. v. Wisvest-Connecticut, LLC*, 791 A.2d 546, 549-50, 259 Conn. 665, 670-71

(Conn. 2002) (collecting cases) (internal quotation marks and citations omitted); *see also Omega*

*Engineering, Inc. v. Omega, S.A.*, 432 F.3d 437, 446 (2d Cir. 2005) (citing *United Illuminating* as

a leading case for determining contractual ambiguity under Connecticut law).

I begin by highlighting the Connecticut Supreme Court's instruction that "the mere fact that

the parties advance different interpretations of the language in question does not necessitate a

conclusion that the language is ambiguous."  791 A.2d at 550.  Palmer cannot simply advance a

dubious interpretation and then rely upon her having done so to have this Court read the Contract more favorably to her.  Palmer is correct that  "[w]here the language is ambiguous . . . we must construe those ambiguities against the drafter."  *Ramirez v. Health Net of Northeast, Inc.*, 938 A.2d 576, 586, 285 Conn. 1, 13-14 (Conn. 2008) (quoting *Cantonbury Heights Condominium Ass'n v. Local Land Dev., LLC*, 873 A.2d 898, 273 Conn. 724, 735 (Conn. 2005)) (internal quotation marks and citations omitted).  But as I discuss below, I do not find that "the language is ambiguous," so there is no need for me to apply this doctrine.

Giving the words of the Contract "their natural and ordinary meaning," the plaintiffs' proposed construction of the prefatory language clearly prevails.  The clause "Seller has no reasonable cause to doubt the accuracy of and hereby represents . . . that . . . the following statements are accurate" is susceptible to only one reasonable interpretation: that the defendant had no cause to doubt the accuracy of her statements *and, simultaneously*, made an affirmative representation that the subsequent statements were affirmatively true.  In particular, the placement of the phrase "and hereby represents" precludes any other result; it would need to be rephrased or omitted entirely in order for the defendant's proposed interpretation to prevail.

Furthermore, Connecticut law requires that I interpret this contract "with each provision read in light of the other provisions."  *United Illuminating*, 791 A.2d at 550.  Taking the Contract as a whole, the intent of the parties is unquestionably "clear and certain from the language of the contract itself," and I clearly perceive that intent to have been that Schedule B makes affirmative representations that were intended to induce the Petrucellis into buying the Premises.

In keeping with basic principles of contractual interpretation, I need to give effect to all the language included in the Contract, because "[t]he law of contract interpretation militates against

interpreting a contract in a way that renders a provision superfluous." *United Illuminating*, 791 A.2d at 552; *see also Ramirez*, 938 A.2d at 586.  According to Palmer, if the point of Schedule B was to make *affirmative* representations, such a reading would render the first part of the sentence — that "Seller has no reasonable cause to doubt the accuracy of" those statements — completely superfluous.  In her view, "[a] more logical interpretation is that the first portion limits the scope of the representation."  Def.'s Memo. in Opp'n [doc. #30] at 4.

While Palmer's argument has some force, the converse argument is more compelling: reading the introductory phrase as a qualification or limitation on the representations in Schedule B renders superfluous the second part of the sentence — "and hereby represents, in order to induce Buyer to enter into this Contract, that . . . the following statements are accurate . . . ."  Indeed, *the entirety of Schedule B* would be largely robbed of its purpose if it operated merely, as defendant suggests, to disclaim any "reasonable cause to doubt the accuracy of" its representations.  Such a disavowal might work to reassure an already-confident buyer, but it would hardly *induce* a cautious buyer "to enter into this Contract."

Furthermore, it is entirely plausible that Schedule B actually makes two meaningful representations to the prospective buyers, as the Petrucellis argue.  That is because it is easy to imagine that one could make an affirmative representation while still harboring some reasonable cause to doubt its accuracy.  For example, if a seller had suffered through years of pernicious and recurrent termite infestations, but the most recent exterminator had certified that no termites remained, that seller could, in theory, affirmatively "represent" that paragraph H of Schedule B was true: "All buildings located on said Premises are free of termites, vermin or other infestation. . . ."  Nevertheless, that hypothetical seller would have reasonable cause to doubt the accuracy of that

representation — because the termites had always returned — and so that seller might negotiate to limit or eliminate either the preamble or the specific representations in paragraph H.

Finally, as I have already mentioned, Palmer points to the doctrine of *contra proferentem* to suggest that "ambiguities are to be construed unfavorably to the drafter."  Black's Law Dictionary, "contra proferentem" (8th ed. online 2004); *see also* Def.'s Mem. in Opp'n [doc. #30] at 7. However, the most recent Connecticut Supreme Court opinion to put forward the reasoning for this policy makes clear that the rule does not apply in all situations.  "That rule tilts the balance against the party who actually drew the contract *whenever two interpretations of a contractual provision seem equally possible*." *Ravitch v. Stollman Poultry Farms, Inc.*, 328 A.2d 711, 717, 165 Conn. 135, 145-46 (Conn. 1973) (emphasis added).

In other words, the doctrine of *contra preferentem* works as a tiebreaker in close cases; it should not be applied when the totality of the contract at issue clearly demonstrates clearly what the parties intended their agreement to be.  For that reason, I decline to apply the doctrine here, where the intent of the parties can be easily determined from the contract's plain language, and where the defendant's interpretation would do far more violence to the plain language of the contract than the plaintiffs' interpretation.

### 2.    Palmer's Statements in Schedule B Were Misrepresentations

It follows from this analysis that Palmer's statements in Schedule B were, in fact, misrepresentations.   This establishes the first, and most basic, element of a claim for misrepresentation that must be found before a claim for any kind of misrepresentation — fraudulent, negligent, or unintentional — may proceed.  *See Citino v. Redev. Agency of City of Hartford*, 721 A.2d 1197, 1207, 51 Conn. App. 262, 275 (Conn. App. 1998).

-14-

Palmer may also have made misrepresentations on the Residential Real Estate Disclosure Report and breached the warranties of the statutory Warranty Deed that she signed.  The Petrucellis level these charges.  Palmer denies them both.  The property disclosure, she argues, is limited by statute to the declarant's own personal knowledge.  *See* Conn. Gen. Stat. § 20-327b(d)(2); *Giametti v. Inspections, Inc.*, 824 A.2d 1, 5, 76 Conn. App. 352, 357 (Conn. App. 2003) ("We hold that the plaintiff could have sought relief under this statute only for a *knowing* misrepresentation in the statutory report." (emphasis in original)).  She also argues that the covenants included in a statutory warranty deed, specified in Conn. Gen. Stat. § 47-36d, "are irrelevant to this case," since there is no claim "that the premises were encumbered beyond the encumbrances set forth in the deed."  Def.'s Mem. [doc. #25-4] at 18-19.

Palmer's argument with respect to the real estate disclosure has more force than her argument with respect to the covenants in the statutory warranty.  But I need not decide these questions, since I conclude that the misrepresentations in Schedule B alone are sufficiently material to justify rescission in this case — and that is the only remedy the Petrucellis seek.

### D.  Reliance on Schedule B

#### 1.  Neither Paragraph 5(b) Nor the Method of Schedule B's Incorporation Precludes the Petrucellis from Relying on That Schedule

Palmer also argues that plaintiffs are precluded from pleading their reliance on Schedule B in light of the disclaimer in paragraph 5(b) of the Contract, which states that "[n]either the Seller, nor any representative of the Seller, has made any representation upon which the Buyer relies . . . except as herein expressly set forth."  Def.'s Mem. [doc. #25-4] at 7-11.  In cases where contracts have included such a disclaimer and did not "expressly set forth" other material representations,

courts in Connecticut have denied plaintiffs a right of recovery. *See Gibson v. Capano*, 699 A.2d 68, 72-73, 241 Conn. 725, 734 (Conn. 1997) ("Despite their actual knowledge of the property's prior condition, the plaintiffs agreed to the clause . . . that disclaimed their reliance on representations made by the defendants. . . . [T]he plaintiffs cannot now argue that they were induced to agree to the clause as a result of the defendants' misrepresentation.") .

Schedule B was incorporated into the Contract by means of a footnote designated by an asterisk at the end of paragraph 5(a).  Palmer argues that because the footnote was appended to paragraph 5(a), it is not "herein expressly set forth" with respect to paragraph 5(b), and therefore paragraph 5(b) limits the scope of any reliance that the Petrucellis may claim. Def.'s Mem. in Opp'n [doc. #30] at 6.

I find this structural argument wholly unpersuasive.  The parties clearly intended to make Schedule B an integral part of their agreement, and Schedule B exists "in order to induce Buyer to enter into this Contract."  The location of the footnote where it is incorporated does not even begin to suggest that the parties actually intended Schedule B to be an empty gesture upon which the buyers could place no reliance.   The disclaimer in paragraph 5(b) is clearly directed at representations that are *outside* the four corners of the Contract.

It is also clear that this is not a simple case, as *Gibson*, where the plaintiffs knew of a potential problem but still agreed to a disclaimer clause in the contract.   Indeed, "a clause disclaiming reliance by the buyer on the seller's representations is a valid contract term" only when it is made "in the absence of a claim of mistake, fraud or unconscionability." *Gibson*, 699 A.2d at 71, 241 Conn. at 731.  Here, the plaintiffs have pleaded *both* fraud and, in the alternative, what amounts to mutual mistake:  "Whether Mrs. Palmer knew that representations were false or she

misrepresented the state of her knowledge by affirmatively representing that she knew that which she did not know, Mrs. Palmer is liable as a matter of law . . . ." Pls.' Local Rule 56(a)(2) Statement [doc. #31] at 3.

### 2.   Record or Constructive Notice of the Plot Plan

Palmer has also contended that reading the Contract as a whole requires the Court to charge the Petrucellis with record notice, or constructive notice, of the plot plan that was on file with the town planning office.  That plot plan, had the Petrucellis examined it closely, would have disclosed to them the exact length of the property's boundaries on either side, and measuring those distances on the actual lot would presumably have led them to the conclusion that some or all of the backyard, where Margaret Petrucelli knew the septic tank to be located, was outside of the property's boundaries.  If she had measured carefully enough, she might even have realized that a corner of the house was outside the rear boundary line.

In support of the proposition that the Petrucellis should be charged with constructive or record notice, Palmer cites only to *Williston on Contracts*, Def's Mem. [doc. #25-4] at 10 (quoting 17 Williston on Contracts § 50:25 (4th ed. Supp. 2008)), and even *Williston* qualifies this rule: "The doctrine of caveat emptor requires a purchaser of real property to ascertain those defects in the property that a reasonable inspection would have disclosed, *unless the seller does or says something to prevent the purchaser from making such an inspection*."  17 Williston on Contracts § 50:32 & n.74 (4th ed. Supp. 2008) (footnotes omitted) (emphasis added).  Besides, the restatements of law counsel the opposite result.  *See, e.g.*, Restatement (Second) of Torts § 540, "Duty To Investigate" (1977) ("The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.").

Moreover, to hold that Margaret Palmer should have measured out any distances at the property is, in my view, tantamount to requiring an amateur survey. But Connecticut cases stand for the opposite proposition — that buyers are not required to obtain a survey when they have affirmative representations that eliminate the need for such a survey. *See Kavarco v. T.J.E., Inc.*, 478 A.2d 257, 262, 2 Conn. App. 294, 301 (Conn. App. 1984) ("The recent weight of authority is that the right to rescind a contract for the sale of land, or a contract for the sale of a business, or a lease, is not necessarily destroyed because the buyer failed to make an independent investigation which would have revealed that the representation upon which he relied was false."). For example, in *Clark v. Haggard*, the Connecticut Supreme Court held that a land buyer was not required to conduct his own survey, so long as the seller had taken it upon himself to make affirmative representations about the property being sold. 109 A.2d 358, 361, 141 Conn. 668, 673 (Conn. 1954) ("Without knowledge, [defendants] recklessly . . . made false representations to induce the plaintiff to rely upon them. The plaintiff did rely upon them to his loss. It matters not that the plaintiff had the opportunity to have the land surveyed. His omission to have a survey made was a natural consequence of the fraudulent misrepresentations.")

In the Petrucellis' case, the plot plan on file at the town hall may have included the distances along the side boundaries of the property, but it was also incomplete in two respects. First, the plan omits any structures on the property whatsover, making it impossible to determine whether the house or other structures were within the bounds of the property *without going to the property and conducting a survey*.[7] Second, the plan on file with the town was incomplete because it omits any

---

[7]     Even if the plaintiffs had undertaken their own amateur survey, as plaintiffs' counsel pointed out at oral argument, the lot lines come off the street at an oblique angle. Thus, it would be difficult for a non-professional to ascertain the exact angle to be used when measuring these

depiction or representation of the land owned by the power company behind the lots shown.  Instead, in the white space behind those lots appears the text "Lake Candlewood," making it appear that the rear boundaries of all of the properties on this map is actually the shoreline, which is not the case: hence this litigation.

In light of the omissions on the plot plan, and because no Connecticut law requires any other result, I decline to charge the Petrucellis with any kind of notice regarding the location of the rear boundary.  Just because the Petrucellis could have connected the dots with a measuring tape and their own amateur survey does not mean that the law requires them to do so, and it does not.  The Restatement allows parties to place reasonable reliance on each others' representations without investigating their accuracy.  The Petrucellis were entitled to rely on the representations made by Palmer in Schedule B.

### 3.      The Petrucellis Relied on Schedule B

Perhaps the most crucial area of disagreement between the parties is on the issue of reliance. In their proposed statement of uncontested facts, the Petrucellis allege that:

> 38.      Although the Petrucellis intended to obtain a survey of the Premises shortly after the closing, they relied on the representations of Mrs. Palmer in deciding that there was not a need to complete the survey prior to the closing. *They specifically relied on Mrs. Palmer's specific representations* that all structures and systems at the Premises, in particular the septic system and leaching fields, were located within the boundaries of the Premises. *The Petrucellis would not have signed the Contract without receiving the representations set forth in Schedule B from Mrs. Palmer.*
>
> . . .
>
> 61.      *The plaintiffs relied on the defendant's explicit*

---

distances from the street.

-19-

*representations* and warranties in the real estate contract, the residential disclosure form, title affidavit and the warranty deed that Mrs. Palmer held good title to the Premises and that the house and the septic system serving the Premises were located entirely within the property boundaries described in the warranty deed. *Had the plaintiffs known of the encroachments before they signed the Contract, they would not have agreed to purchase the Premises.*

Pls.' Local Rule 56(a)(1) Statement [doc. #27] ¶¶ 38, 61, at 11, 17-18 (emphases added).

Palmer denies these paragraphs in her counter-statement,[8] and cites several portions of Margaret Petrucelli's deposition as evidence. First, she points to Margaret Petrucelli's statement in her deposition that she first heard term 440' contour line "before the closing" and she understood it to mean "that who owned the lake owned up to that line," Depo. of Margaret Petrucelli, Def.'s Local Rule 56(a)(2) Statement, Ex. C [doc. #30-2 at 18] ll. 8-23. Palmer also points to Margaret Petrucelli's deposition statement that she "measured the house" with a tape measure "just to see how wide the actual house" was, [doc. #30-2 at 19] ll. 3-15, and the fact that the septic inspector Dennis Carlson pointed out to Margaret Petrucelli where the sceptic tank and leaching fields were located on the lot, and that "he could have" said something to her about the 440' contour line, although Margaret Petrucelli did not "remember any discussions about that with him." [doc. #30-2 at 20] ll. 3-16. Palmer also cites several pages of Margaret Petrucelli's deposition testimony concerning her

---

[8]     Palmer originally admitted paragraph 61, but she subsequently amended her Local Rule 56(a)(2) Statement to deny it. *See* Def.'s Request for Leave to Amend Local Rule 56(a)(2) Statement [doc. #36] at 1-2. She cited no additional items in the factual record, and merely stated that "[s]uch denial is entirely consistent with the defendant's arguments throughout her own Motion for Summary Judgment and in her opposition to Plaintiff's Motion for Summary Judgment regarding the issue of the plaintiff's reliance on the alleged misrepresentations." *Id.* Because the allegations in the plaintiffs' paragraphs 38 and 61 are similar, I presume that she would have cited the same facts if compelled to cite particular elements in the factual record.

sources of information for the rear boundary of the property.[9]

---

[9]      In those excerpts, Palmer's attorney asked Margaret Petrucelli "What was your understanding as of [the time when she went to the closing] as to the physical location of the rear boundary line?"

A      Well, there's a seawall that's down below.  And at one point the selling realtor had -- there's a tree down there.  And we looked down there at the water.  And at one point she said, "No.  That's my brother-in-law's, who lives next door."  And the tree is next to the seawall.  ["]That's my brother-in-law's property."   So I thought it was -- I thought it was down around there."

[doc. #30-2 at 21] ll. 20-25; [*id.* at 22] ll. 1-5.

Q      All right.  So, again, as of the date of the closing, your understanding of where the rear boundary line was based on [Palmer's realtor] Elaine Hicks' comment regarding the tree shown on this map; is that fair to say?

A      Yeah.

Q      Okay.

A      Yeah.  And -- yeah.

Q      All right.  Now, there's only one tree on the map, right?

[doc. #30-2 at 25] ll.16-25.

Q      Is there anything else that was relevant to your belief as to where the rear boundary line was?

MR. TINLEY: I'm going to object.  When you say as of the date of the closing, are you including the closing documents, because that's --

MR. ARCONTI: All right.  Fair enough.  Yeah.

BY MR. ARCONTI:

Q      Apart from the closing documents, before you walk into the closing room -- and I'm specifically talking about the rear boundary line --

A      Uh-huh.

Q      I'm just trying to understand what your understanding was as to where the rear boundary line was located.

A      My understanding, that it was located where this 440 line was, down by the water.

Q      Okay.  So you knew that the 440 line, wherever it was, was the rear boundary, correct?

Lastly, Palmer cites the Petrucellis' response to an interrogatory to regarding the number of times they personally visited the premises before the closing, to which they responded that Margaret Petrucelli personally visited "approximately three" times, while Michael Petrucelli visited "approximately two" times. [Doc. #30-2 at 31].

---

  A  That was my understanding.

  Q  Okay.  When did you first come to that understanding that the 440 contour line was the rear boundary?

  A  I don't remember.

  Q  But it was before the closing, correct?

  A  Yes.

  Q  And how did you come to that understanding?  Was it based on conversations with neighbors, or family members, or realtors?

  A  No.  I didn't know the neighbors.  No family members.  I didn't remember discussing it with Michael's parents.  Like I said, he talks to them more about this type of thing.  Quite frankly, I didn't know -- understand what a 440 line was.

  Q  Okay.  But you knew you owned up to that 440 contour line, correct?

  A  Yes.

  Q  Okay.

  A  And had right of way, or whatever.

  Q  Okay.  Would it be fair to say that, although you knew you owned up to the 440 contour line, you did not know physically where that line fell on your property until you got the Hiro survey [after the closing]?

  A  That is correct.

*Id.* at 26-27.  Palmer also cites other excerpts of deposition testimony concerning the tree, the seawall, and the question of who "owned" the dock, none of which illuminate this analysis.

The implication that Palmer seeks to create from all this testimony is that the Petrucellis did not *actually rely* on Schedule B for their understanding of the location of the rear boundary, either when they signed the contract for sale or when they closed on the property.  Presumably, at trial, she would ask a jury to speculate that the Petrucellis might have relied on something other than Schedule B, such as perhaps their own intuition, or on Margaret Petrucelli's conversation with Palmer's realtor, or on representations made by other persons unknown — indeed, "[a]part from the closing documents," [doc. #30-2 at 26] l. 13, the Petrucellis could have relied on anything within the universe of things they knew, or might have known, about the property prior to the closing.

In essence, the parties are arguing over a hypothetical: What would the Petrucellis have done if the Contract had *not* included the representations contained within Schedule B?  If the Petrucellis could satisfy the jury that they would not have signed the contract without Schedule B, then that would logically imply that they had relied, in fact, on Schedule B.

But this hypothetical, which cannot be proved, distracts from the real question that the jury would have to decide, which is not what *might* have happened, but what actually *did* happen.  On the record before me, I find that no reasonable jury could conclude anything other than that the Petrucellis did in fact rely on the representations in Schedule B.

This conclusion is built on several observations, which are uncontested in the record.  First, I note that the first draft of the contract for sale was drafted by Palmer's attorney in the transaction, and it did not contain Schedule B.  Pls.' Local Rule 56(a)(1) Statement [doc. #27] ¶¶ 15, 17, 23.  Crucially, however, the contract already did contain paragraph 5(b), *id.*, which is in the mold of an integration clause, and in which the Petrucellis *disavowed any reliance* on "any representation . . . as to the make, quality, value, condition or other matter relating to the premises or any building,

system, fixture or appliance located thereon, *except as herein expressly set forth.*"  *Id.* at Ex. Q [doc. #27-19] ¶ 5(b) (emphases added).

It is entirely understandable, then, that the Petrucellis' attorney in the transaction would have been dissatisfied with the contract presented by Palmer, since there was almost nothing upon which the Petrucellis could rely in the way of representations about the property.  The Petrucellis' attorney therefore incorporated into the contract a *new* set of representations upon which the Petrucellis *could* rely, in the form of Schedule B.  Pls.' Local Rule 56(a)(1) Statement [doc. #27] ¶ 17.  This is the version of the contract that he forwarded to his clients for their signature.  *Id.*

It is also clear that the Petrucellis were paying close attention to Schedule B, since it is uncontested that the attorney "and Mrs. Petrucelli exchanged four drafts of Schedule B before the Petrucellis were satisfied and agreed to execute the contract."  *Id.*  Indeed, Mrs. Petrucelli averred that "[i]n my review of the various drafts of Schedule B, I had noted, relied upon, and considered as essential terms the seller's representations that the Premises comply with all applicable planning, zoning and health code regulations and that the buildings and systems, specifically including the septic system and leaching fields, are located entirely within the boundaries of the Premises."  *Id.* Ex. K, Aff. of Margaret Petrucelli [doc. #27-13] ¶ 12.

When Palmer's attorney received the proposed contract from the Petrucellis' attorney, he made only one minor modification to Schedule B before forwarding it to his client for her signature. Pls.' Local Rule 56(a)(1) Statement [doc. #27] ¶¶ 25-27.

In addition to this exchange of drafts, which is uncontested in the record, I rest my conclusion on the plain language of Schedule B, which expressly states that its sole purpose was to induce the Petrucellis to enter into the transaction.  As I have already described, it is also beyond dispute that

Schedule B contained significant and material misrepresentations of fact. "An actionable misrepresentation, whether made knowingly, recklessly, negligently or innocently, must be made for the purpose of inducing action upon it." *J. Frederick Scholes Agency v. Mitchell*, 464 A.2d 795, 799, 191 Conn. 353, 359 (Conn. 1983). Inducement and reliance are two sides of the same coin: if Schedule B *did induce* the Petrucellis to enter this contract, as all parties intended, then the logical consequence is that the Petrucellis must have relied on its representations.

On these uncontested facts, I find that no reasonable jury could reach any conclusion other than that the Petrucellis were desirous of representations about the state of the Premises, that they bargained for those representations, and that those representations were given for only one reason: so that the Petrucellis could rely on them. In sum, there is no genuine issue of fact as to reliance, because it is clear that the Petrucellis did rely on Schedule B.

Finally, the Connecticut Appellate Court has held that in cases where a misrepresentation is clear and where it is clear that the plaintiff relied to his detriment on that misrepresentation, all the necessary elements of a claim for rescission are established as a matter of law, and summary judgment for the plaintiff is appropriate. *See Paul Revere Life Ins. Co. v. Pastena*, 725 A.2d 996, 998, 52 Conn. App. 318, 322 (Conn. App. 1999) ("[T]he misrepresentation was material because it is clear, both on the face of the application and through the affidavits submitted, that the plaintiff would not have issued the insurance policy without the defendant's promise to discontinue her ACS policy. . . . Because no genuine issues of material fact exist, the trial court properly concluded that the plaintiff was entitled to judgment as a matter of law." (footnote omitted)).

### 4.    The Petrucellis' Reliance Was Reasonable

In many cases, the reasonableness of a plaintiff's reliance is a question for the trier of fact.

*See, e.g.*, *Williams Ford, Inc. v. Hartford Courant Co.*, 657 A.2d 212, 222, 232 Conn. 559, 579-580 (Conn. 1995) ("[T]o state a claim of negligent misrepresentation, the plaintiff must allege and prove that the reliance on the misstatement was justified or reasonable. We have consistently held that reasonableness is a question of fact for the trier to determine based on all of the circumstances."); *Vertrue Inc. v. Meshkin*, 429 F. Supp. 2d 479, 499-500 (D. Conn. 2006) (citing Connecticut cases) ("[T]he issue of whether Plaintiff's reliance on the representations were reasonable is a question of fact not properly decided on a motion to dismiss.").

But as I have already discussed, in certain circumstances the Connecticut courts have found reliance on contractual representations to be reasonable as a matter of law.  *See Paul Revere Life Ins. Co.*, 725 A.2d at 998,  52 Conn. App. at 322.  As in that case, the parties here signed a contract whose plain language indicates that the representations contained therein were intended to induce the plaintiffs' reliance.

In an attempt to create a question of fact as to the reasonableness of the Petrucellis' reliance on her misrepresentations, Palmer draws attention to evidence in the record that she thinks would create doubt in the mind of a reasonable person as to the accuracy of those representations.   In particular, she suggests that the Petrucellis made their own "investigation," upon which they may have relied when signing the contract of sale and taking title at the closing.

> Had the plaintiffs identified the extent of the sideline boundaries by using the tape measure that Mrs. Petrucelli used to measure the house, or had they retained the surveyor before the closing, the parties would not be before this court.  Instead, they chose to ignore some very obvious warning signs despite being intelligent, highly educated buyers, one of whom had considerable experience in the mortgage lending field.

Def.'s Mem. [doc. #25-4] at 20.

But Palmer's arguments are insufficient as a matter of law, because there is nothing in the record to show that the Petrucellis might have known — or had any reason to doubt — that the house and septic system were entirely within the boundaries of the property they were buying.  While the record demonstrates that the Petrucellis undertook an investigation into contingencies specified in the Contract, it equally demonstrates that they undertook no investigation into the borders of the property.  Moreover, I fail to see how the Petrucellis were faced with "very obvious warning signs."  Quite to the contrary, even construing all the evidence in Palmer's favor, I find that no reasonable jury could return a verdict that the Petrucellis' reliance on Schedule B was anything but reasonable.

### E.     Liability in Contract

The plaintiffs' first cause of action is for breach of contract.  I have already found that Palmer made unambiguous, affirmative misrepresentations in Schedule B.  Since it uncontested that the Premises that Palmer delivered did not comport with those representations, I conclude without difficulty that there is no genuine issue of material fact on Count One.  Palmer breached the Contract.

As to the relief requested, Connecticut law clearly allows and even encourages rescission as a remedy for complaint that sounds in "breach of contract."  Connecticut's Appellate Court has said that "rescission and restitution is an alternative to damages in an action for breach of contract . . . . [Rescission] places the parties, as nearly as possible, in the same situation as existed just prior to the execution of the contract."  *Wallenta v. Moscowitz*, 839 A.2d 641, 660, 81 Conn. App. 213, 240-41 (Conn. App. 2004) (quoting *Kavarco*, 478 A.2d at 261, 2 Conn. App. at 299); *see also United States v. Gregory*, 245 F.3d 160, 166 (2d Cir. 2001) ("[R]escission is intended to be a remedy for the injured party, i.e., the defrauded party or the party injured by a breach of a contract.") (citing

*Kavarco*).

In a complaint that sounds in breach of contract, the elements of a successful claim for rescission are that "there has been a *material misrepresentation* of fact upon which a party *relied* and which *caused* it to enter the contract. The material misrepresentation, when made in connection with the sale of land, may be an innocent misrepresentation." *Kavarco*, 478 A.2d at 261, 2 Conn. App. at 299 (emphases added; citations omitted). Because the misrepresentation may be innocent, Palmer's state of mind when making the misrepresentation is irrelevant to the claim for breach of contract, and thus with respect to the claim for breach of contract, any issue of fact with respect to Palmer's knowledge of the boundary is not material.

I have already discussed my finding that Palmer made material misrepresentations in Schedule B, which was incorporated by reference into the parties' contract. I have also concluded that no reasonable jury could reach any result other than that the Petrucellis relied on those misrepresentations, and because the Petrucellis actually did enter the contract, the fact of their reliance implies that the misrepresentations caused them to enter into the Contract.

Another "condition precedent to rescission is the offer to restore the other party to its former condition as nearly as possible." *Kavarco*, 478 A.2d at 261 (citing *Duksa v. Middletown*, 472 A.2d 1, 4, 192 Conn. 191 (Conn. 1984)). Here, there is no dispute that the plaintiffs made such an offer, and that the defendant refused. *See* Pls.' Local Rule 56(a)(1) Statement [doc. #27] ¶¶ 62-63; Def.'s Local Rule 56(a)(2) Statement [doc. #30-2] ¶¶ 62-63.

Finally, if rescission is chosen as a remedy, it usually operates as a waiver of the right to sue for damages. *Duksa*, 472 A.2d at 7, 192 Conn. at 204; *see also Kavarco*, 478 A.2d at 261. Usually, a judgment cannot stand if both damages and rescission are awarded. *Duksa* at 206, 472 A.2d at

8-9. Since the Petrucellis have expressly disavowed any claim for damages at the summary judgment stage, they are entitled to seek rescission.[10]

Another contract theory which supports the rescission of the Contract in this case is the concept of mistake, whereby a contract is voidable when one or both parties to the contract are suffering under a misconception as to the actual state of the world. Plaintiffs have not put this theory forward directly, but it surfaces repeatedly in their briefs. *See, e.g.*, Pls.' Mem. [doc. #28] at 21 (citing *Duksa*, 376 A.2d at 1101, 173 Conn. at 128, for the proposition that rescission is appropriate in the case of a "mistake induced by an innocent but material misrepresentation"). Indeed, it is blackletter law that a contract is voidable on grounds of "mistake, fraud, or unconscionability." *Wallenta v. Moscowitz*, 839 A.2d at 650.

According to the Restatement (Second) of Contracts, a mutual mistake by all parties to the contract renders the agreement voidable, *see* Restatement (Second) of Contracts § 152 (1981),[11] and

---

[10] The Petrucellis do make a claim for *consequential* damages as part of the equitable remedy of rescission, since that remedy seeks to return the parties as nearly as possible to the *status quo ante*. That is not the same as a pure claim for damages, which would operate to preclude a claim for rescission. I address the permissibility of the claim for consequential damages *infra* during my discussion of the equitable remedy of rescission.

[11] According to the Restatement, "[w]here a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154." Restatement (Second) of Contracts § 152(1) (1981). Under the rule stated in § 154, "A party bears the risk of a mistake when (a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." *Id.* § 154. Applying that rule, *both* parties had limited knowledge but treated their limited knowledge as sufficient, and the Contract does not "allocate" the risk of mistake to either party, except for assumptions outside the Contract, as stated in paragraph 5(b). Thus, neither party bears the risk of mistake alone, and that risk should be shared equally.

a mistake by one party renders the contract voidable at that party's election if enforcement would be unconscionable or if "the other party had reason to know of the mistake or his fault caused the mistake." *Id.* § 153; *see also id.* § 7 (voidable contracts defined); *id.* § 154 (when a party bears the risk of mistake). Thus, if both the Petrucellis and Palmer were mistaken as to the location of the rear boundary at the Premises, then the contract is voidable by the Petrucellis, who are the "adversely affected party." *Id.* § 152. In any event, the Petrucellis are entitled to rescind the contract because "[Palmer's] fault caused the mistake," since (even accepting Palmer's denial of knowledge of the boundary) she affirmatively represented in Schedule B something she did not know to be true, and the Petrucellis relied on that misrepresentation.

Because I hold that the Petrucellis are entitled to rescission on a purely contractual theory, there is no need to decide the remainder of their claims, which sound in tort and equity. However, in the interests of a full and complete resolution of this matter, I nevertheless consider all those claims in the alternative.

### F.    Liability in Tort

The Petrucellis have alleged three counts that sound in tort: fraud in the sale of property (Count Two), negligent misrepresentation (Count Three), and innocent misrepresentation (Count Four).

### 1.    Count Two: Fraud in the Sale of Property

In order for the plaintiffs to succeed on a claim of fraud, they must prove by clear and convincing evidence that "(1) a false representation was made as a statement of fact; (2) it was untrue *and known to be untrue* by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Wallenta*, 839 A.2d

at 648 n.2 (emphasis added) (quoting *Anastasia v. Beautiful You Hair Designs, Inc.*, 767 A.2d 118, 61 Conn. App. 471, 477 (Conn. App. 2001)); *see also Kilduff v. Adams, Inc.*, 593 A.2d 478, 486, 219 Conn. 314, 328 (Conn. 1991) (stating the same elements).

The Petrucellis' claim of fraud is weakest on the question of whether Palmer actually knew that the representations she made in Schedule B were untrue.  But under an a series of earlier Connecticut Supreme Court cases, a claim for fraud can also succeed if a defendant "asserts that he knows what he does not know."  *Clark v. Haggard*, 109 A.2d at 361, 141 Conn. at 672-73; *see also Warman v. Delaney*, 172 A.2d 188, 189-90, 148 Conn. 469, 473-74 (Conn. 1961) ("Even though the defendant believed her representations to be true, if that belief was groundless the uttering of them to induce action on the part of the plaintiffs constituted a reckless deception of the plaintiffs, upon which they relied and acted to their damage. . . . It matters not that the plaintiffs had the opportunity to have the land surveyed.  Their omission of a survey was a natural consequence of the fraudulent representations." (citations omitted)).  Under this line of cases, Palmer is liable for fraud whether she knew her misrepresentations in Schedule B to be false or not.  Plaintiffs also correctly note that "[t]he [Connecticut Supreme] Court recently reaffirmed the viability of this line of cases."  Pls.' Mem. [doc. #28] at 26 (citing *Kramer v. Petisi*, 940 A.2d 800, 285 Conn. 674 (Conn. 2008)).  Indeed, in summarizing the elements of a successful claim for fraud in *Kilduff v. Adams, Inc.*, the Connecticut Supreme Court attached a footnote to the second element — "that [the misrepresentation] was untrue and known to be untrue by the party making it" — remarking that "[w]e have held that a misrepresentation made without belief in its truth or recklessly made can also provide the basis for a fraud claim."  593 A.2d at 486 & n.15 (citing *Clark v. Haggard*).

But the Connecticut Supreme Court's most recent reaffirmation is also a clarification.  In

-31-

*Kramer v. Petisi*, it held that in an action for negligent misrepresentation of a property line, a defendant could rely for a defense on the doctrine of comparative negligence. In so doing, it also reaffirmed that the doctrine of comparative negligence is *not* available in an action for fraudulent misrepresentation, with the distinction between the two torts being that "fraudulent misrepresentation is an intentional tort." 940 A.2d at 807.

> [I]t is the rule of law in virtually all states that fault should not be apportioned between an intentional tortfeasor and a merely negligent victim. The reasons underlying this rule are persuasive. Intentional torts are punished not because the actor failed to use reasonable care ... but because the actor intended the act. The difference between the victim's actions and the defendant's action is not one of degree ... but of kind, and they are therefore not comparable.

*Id.* (citations omitted; ellipses in original).

So while the Connecticut Supreme Court has "reaffirmed" the holding in earlier cases that fraudulent misrepresentation is not amenable to a defense of comparative negligence, it has simultaneously emphasized the *intentionality* that is required in a claim for fraudulent misrepresentation — which is why it is not amenable to an analysis of comparative negligence. *See Kramer*, 940 A.2d at 806 n.9 ("We also note that, at common law, fraudulent misrepresentation and intentional misrepresentation are the same tort."). Finally, there is a higher standard of proof required to succeed in a claim for fraudulent misrepresentation. That standard is clear and convincing evidence, as opposed to a preponderance of the evidence in negligent and innocent misrepresentation theories. *Wallenta*, 839 A.2 at 649; *see also Kilduff*, 593 A.2d at 486 & n.14 (discussing the rationale for this heightened burden of proof). That disparity suggests that a claim for fraudulent or intentional misrepresentation is directed at a type of behavior that is more intentional or reckless than a truly "innocent" unknowing misrepresentation.

Indeed, in one of the earlier discussions of the rule that speaking "when conscious of [one's] ignorance" constitutes "act[ing] in bad faith," the Connecticut Supreme Court set out the justification for this rule at length. *Bd. of Water Com'rs of City of New London v. Robbins & Potter,* 74 A. 938, 946-47, 82 Conn. 623, 644 (Conn. 1910).[12]

While the *per se* fraud liability rule announced in *Clark v. Haggard*, *Warman v. Delaney* and

---

[12]     In that opinion, the Connecticut Supreme Court held that a lower court correctly applied the rule with representations where the speaker had a heightened ability to know the truth:

> They were therefore, as we have seen, representations so made that they carried with them the assertion of being made upon some basis of superior knowledge and information. Their purpose was to supply information to persons who were expected to act upon it in a business dealing with those who made them, and who were entitled to accept and act upon it as expressing what it purported to express, to wit, information having a basis in such superior knowledge.  As applicable to such representations, it is true that if one takes it upon himself to make them for the purpose of influencing another's action, and they do influence his action, and the pretense of knowledge proves to be unfounded and the representations false, the result accomplished by such means will be regarded as tainted with fraud. "In matters susceptible of actual knowledge, if the party who has, and is known to have, the best means of knowledge makes an affirmation contrary to the truth, in order to secure some benefit to himself, the law will treat him as stating that he knows that whereof he affirms, and so is guilty of a fraud, although he spoke in ignorance of the facts, because he asserts that he knows what he does not know." Scholfield Gear & Pulley Co. v. Scholfield, 71 Conn. 1, 19, 40 Atl. 1046, 1051.  See, also, Chase's Appeal, 57 Conn. 236, 263, 18 Atl. 96 et seq.   "This rule is based upon the principle that the speaker is conscious either that he knows or does not know the truth of what he states and that when conscious of his ignorance, he assumes to have knowledge he acts in bad faith, and must be held to warrant the truth of his assertion, and so is liable in an action of deceit." 20 Cyc. 27, note.

74 A. at 947.  In this case, on the record available at summary judgment, it is not clear to me that a jury would be compelled to find that Palmer had, and was known to have, "the best means of knowledge."

other older cases may still be viable, it seems more likely to me that such strict-liability claims like the one the Petrucellis assert are better raised today under the caption of negligent or innocent misrepresentation.  At the very least, in light the Connecticut Supreme Court's recent distinction between those torts, I cannot conclude on this record that a reasonable jury would be forced to conclude, by clear and convincing evidence, that Palmer's misrepresentations were made with the intentionality or "recklessness" that a successful claim for fraudulent misrepresentation appears to require.

### 2.      Count Three: Negligent Misrepresentation

The elements of a claim for negligent misrepresentation are set forth in the Restatement of Torts: "One who . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."  *Citino v. Redev. Agency of the City of Hartford*, 721 A.2d at 1206, 51 Conn. App. at 273-274 (quoting Restatement (Second) of Torts § 552 (1979); collecting Connecticut cases). More recently, the Connecticut Supreme Court has enumerated those elements: "Traditionally, an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Nazami v. Patrons Mut. Ins. Co.*, 910 A.2d 209, 213, 280 Conn. 619, 626 (Conn. 2006).

I have already concluded that a reasonable jury would certainly find the first and third elements of this claim to exist — namely, a misrepresentation that was reasonably relied upon by the plaintiffs.  Similarly, Palmer "knew or should have known" that she lacked sufficient information

to make a representation about the boundary, and therefore that she could not affirmatively "represent" the truth of anything concerning the boundaries of the Premises. The final element is the "pecuniary" harm suffered by the Petrucellis as a result of this misrepresentation. While the exact amount of pecuniary harm is difficult to monetize, it is beyond question that the Petrucellis have suffered at least some pecuniary damage as a result of this situation, both in consequential expenses (which they have itemized) and in terms of the diminished value of the home subsequent to the discovery of the boundary problem.

As I have already discussed, a claim for negligent misrepresentation is subject to the mitigating influence of the doctrine of comparative negligence, and that is the primary defense put forward by Palmer in several of her counts. Specifically, she alleges that the Petrucellis were contributorily negligent by failing to obtain a survey for themselves prior to the closing. Palmer argues that whatever negligence she exhibited by making declarations that she did not know to be true was surpassed by the Petrucellis' negligence in failing to obtain a survey of the property they were buying.

> Whether or not it is "customary" to obtain a survey begs the question of whether the facts in this case support a defense of contributory negligence. In light of the tiny acreage of .10 acres; Mrs. Petrucelli's presence at the onsite inspection; the fact she bothered to measure the house with a tape measure but chose not to measure the short sidelines of 91.5 feet and 113 feet; and the fact that she choose to rely on the realtor's verbal depiction of the location of the rear line, the answer is resoundingly "yes".

Def.'s Mem. in Opp'n [doc. #30] at 9.[13]

---

[13]   Palmer also states that "[w]hile the doctrine of caveat emptor has been gradually diminished in Connecticut, it is not extinct. The facts of this case cry out for its application, as the plaintiffs' claim that they relied upon limited representations contained in a preprinted addendum, while discounting the consequences of their own investigation, borders on the

Plaintiffs object that this line of argument on several grounds, including that it seeks to introduce expert testimony, while no experts were disclosed during discovery.[14]  Arguments as to what is "customary," plaintiffs argue, clearly constitutes "custom and practice" expert testimony under Second Circuit law.  *See Saye v. Old Hill Partners, Inc.*, 478 F. Supp. 2d 248, 272 (D. Conn. 2007) (witness who was not offered as an expert "may not opine about the custom and practice" in his industry).

I do not see any need to resolve the question of the admissibility of evidence regarding the local custom and practice surrounding surveys, because I have already found that it was Palmer's material misrepresentations on Schedule B which induced the Petrucellis to buy this home.  In the face of such a direct causal connection, no amount of comparative negligence will excuse Palmer from her responsibilities in this respect.

Furthermore, the Petrucellis argue that, under Connecticut law, Palmer bears the burden of proof when asserting the affirmative defense of contributory negligence.  *See, e.g.*, *Hernandez v.*

---

absurd."  Def.'s Mem. [doc. #25-4] at 20.

[14]    Palmer responds by pointing to similar evidence offered by the plaintiffs, who also did not disclose any experts.  Specifically, the Petrucellis introduced an affidavit by their attorney in the real estate transaction:

> In my experience, it is not normal, nor is it typically required by lending institutions, that purchasers of residential real estate in Connecticut obtain a survey prior to closing.  This is particularly true where, as in this case, the seller has owned the Premises for an extended period of time, delivers a warranty deed at closing, and has made affirmative and detailed representations regarding property boundaries, the location of all structures and systems within said boundaries, and the compliance of the Premises with all applicable governmental laws and regulations.

Aff. of Joseph Biraglia, Esq. [doc. #27-16] at 4.  Because I do not rely on either side's evidence in this respect, I need not decide whether this evidence was admissible for consideration at the summary judgment stage.

*Dawson*, 953 A.2d 664, 666-67, 109 Conn. App. 639, 642 (Conn. App. 2008); *see also* Conn. Gen.

Stat. § 52-114 (allocating this burden of proof in personal injury and property damage tort cases, and

creating the presumption that plaintiffs in such cases acted "in the exercise of reasonable care");

*Juchniewicz v. Bridgeport Hosp.*, 914 A.2d 511, 517, 281 Conn. 29, 39 (2007) (determining that this

statute "is now a statute of general applicability to *all negligence actions*" (emphasis added));

*Kramer*, 285 Conn. at 679-80 (quoting trial court's jury charge that "[t]here's a presumption that a

person is acting in due care"). *But see Weinshel v. Willott, LLC*, No. CV03-0405088, 2006 Ct. Sup.

7059, 2006 WL 1229933, *6 (Conn. Super. Ct. Apr. 13, 2006) (unpublished opinion) (emphasizing

that the statute applies to "negligence actions to recover damages for injuries to persons or

property").  Again, I do not think the doctrine is relevant, but in any event, on this record as a whole,

I find that no jury could have found that the Petrucellis were more negligent than Palmer.

During oral argument, Palmer's attorney cited the Restatement (Second) of Torts for the

proposition that the Petrcuellis could not establish tort liability based on Palmer's misrepresentations

if their decision to engage in a transaction was actually the result of their own private investigation.[15]

But the illustrations provided in the Restatement actually militate against the application of these

---

[15]     Palmer relies on the following section from the Restatement (Second) of Torts:
              § 547. Recipient Relying On His Own Investigation

         (1) Except as stated in Subsection (2), the maker of a fraudulent
         misrepresentation is not liable to another whose decision to engage in
         the transaction that the representation was intended to induce is not
         caused by his belief in the truth of the representation but is the result
         of an independent investigation made by him.

         (2) The fact that the recipient of a fraudulent misrepresentation is
         relying upon his own investigation does not relieve the maker from
         liability if he by false statements or otherwise intentionally prevents
         the investigation from being effective.

Restatement (Second) of Torts § 547 (1977).

principles in this case:

> 1. A, seeking to sell a house to B, makes fraudulent statements to B that the floors in the house are sound. B inspects the house, and walks over the floors, which are full of large and obvious holes. B then buys the house from A. A is not liable to B.

> 2. The same facts as in Illustration 1, except that the floors are apparently sound but have dangerously weakened supports, not discoverable by ordinary examination. A is subject to liability to B.

Restatement (Second) of Torts § 547 cmt. on subsection (1).

I conclude that no reasonable jury could find other than that Palmer is liable for her misstatements under a theory of negligent misrepresentation. Rescission has been allowed as a permissible remedy in a case that included a claim for negligent misrepresentation among others. *See Wallenta v. Moscowitz*, 839 A.2d at 653. Thus, the plaintiffs are entitled to their requested remedy on this count.

### 3.      Count Four: Innocent Misrepresentation

Of all of the counts alleged by the Petrucellis, the claim of innocent misrepresentation comes the closest to a "strict liability" tort. *See*, *Johnson v. Healy*, 405 A.2d 54, 56-57, 176 Conn. 97, 101-02 (Conn. 1978) (extending this "strict liability" from the sale of goods to transactions for the sale of land). In its recent discussion of contributory negligence in *Kramer v. Petisi*, the Connecticut Supreme Court also emphasized the distinction between negligent misrepresentation, a tort, and innocent misrepresentation, which "is predicated on principles of warranty." 940 A.2d at 808 n.10.

The elements of a claim for innocent misrepresentation are simpler than those for fraudulent or negligent misrepresentation.

> The elements of innocent misrepresentation are (1) a representation of material fact (2) made for the purpose of inducing the purchase, (3)

-38-

> the representation is untrue, and (4) there is justifiable reliance by the
> plaintiff on the representation by the defendant and (5) damages.

*Frimberger v. Anzellotti*, 594 A.2d 1029, 1034, 25 Conn. App. 401, 410 (Conn. App. 1991).  There is no need to repeat the analysis of the previous sections; all the elements of a claim for innocent representation are clearly established in the record, and no reasonable jury could find otherwise. Since the plaintiffs have elected to forego the traditional remedy of damages, rescission is appropriate.

### G.    Plaintiffs' Equitable Claim for Rescission

For their fifth and final cause of action, the Petrucellis simply plead "rescission."  In seeking this equitable remedy, the plaintiffs cite Connecticut case law which allows rescission to be pled as a separate claim for relief.  *See, e.g.*, *Altberg v. Paul Kovacs Tire Shop, Inc.*, 626 A.2d 804, 31 Conn. App. 634, 640-41 (Conn. App. 1993).

Balancing the equities "is a matter for the discretion of the trial court."  *Wallenta v. Moscowitz*, 839 A.2d at 660, 81 Conn. App. at 241.  "[T]he decision to award a remedy for rescission for breach of contract always depends upon a showing of what justice requires in the particular circumstances, and thus necessarily rests in the discretion of the trial court."  *Diamond v. Marcinek*, 632 A.2d 46, 47, 32 Conn. App. 828, 828-30 (Conn. App. 1993) (quoting *Burt's Spirit Shop, Inc. v. Ridgway*, 576 A.2d 1267, 215 Conn. 355, 361 (Conn. 1990)).

Palmer contends that this transaction should not be disturbed, and the plaintiffs' claims should be denied, because "there is a workable solution" to allow for a new septic system to be installed, and "a license can be obtained for the encroachment of the house."  Def.'s Mem. in Opp'n [doc. #30] at 10.  Without placing any particular reliance on possibly inadmissible expert testimony,

I would simply note that the Petrucellis allege, and Palmer admits, that a representative of FirstLight advised Mrs. Petrucelli that "it would not issue a license or grant other permission to maintain the septic system encroachment," but might allow the house encroachment to remain in place.  Pls.' Local Rule 56(a)(1) Statement [doc. #27] ¶ 60; Def.'s Local Rule 56(a)(2) Statement [doc. #30-2] ¶ 60.

But more importantly, the Petrucellis did not intend to purchase, nor does it appear that Palmer intended to sell, a piece of property that was legally and physically constrained in the way the Premises now appear to be.  I am guided in particular by the Connecticut Appellate Court's reasoning in *Kavarco*:

> The equitable remedy of rescission is not barred because of the fact that the defrauded party suffered no pecuniary loss.  The purchase of real estate for a residence happens infrequently in the lifetime of the average family.   The very fact that the land did not have the fundamental characteristics which were attributed to it by the seller is sufficient in and of itself to show that the buyer suffered damage or irreparable harm.  If damages would be inadequate for justice in a particular case, rescission and restitution is the proper remedy.[16]

*Kavarco*, 478 A.2d at 261,  2 Conn. App. at 299-300.  I find that here, damages would indeed be "inadequate for justice," and therefore rescission is the only proper remedy.

---

[16]    Although the Appellate Court refers to both "rescission and restitution" as though they were part of the same remedy (singular), I note that these are more appropriately considered as two separate concepts.  *See* Black's Law Dictionary, "Restitution" (8th ed. 2004) (defining restitution primarily as a kind of compensation for "unjust enrichment," and the set of associated remedies "in which the measure of recovery is usu[ally] based not on the plaintiff's loss, but on the defendant's gain").  As the Appellate Court considered in *Wallenta v. Moscowitz*, principles of restitution, in a case of rescission, will address the question of how to credit each side for the benefits they have derived from the property that changed hands, during the time between the execution of the contract and its later rescission.  *See* 839 A.2d at 660-62.  Neither party in this case has alleged that the Court should setoff any recovery to account for such unjust enrichment.

### H.   Plaintiffs Are Entitled in Equity To Recover Their Consequential Damages

In addition to a complete unmaking of the contract, the Petrucellis have also sought to be compensated, in equity, for the expenses they incurred as a result of the voidable contract to buy the Premises. Those claimed expenses total $90,323.69.  They are itemized in an affidavit executed by Margaret Petrucelli.  The principal items are legal fees and costs the plaintiffs incurred in this action, totaling $37,319.92, and mortgage payments paid by plaintiffs after the closing, totaling $23,982.00. The other items are for closing costs, taxes, surveys, minor repairs to the house, and similar expenses.

"Rescission, simply stated, is the unmaking of a contract.  It is a renouncement of the contract and any property obtained pursuant to the contract and places the parties, as nearly as possible, in the same situation as existed *just prior to the execution of the contract*."  *Kavarco*, 478 A.2d at 261 (emphasis added); *see also Wallenta v. Moscowitz*, 839 A.2d at 660 (quoting the same).

For the non-legal expenses itemized in Margaret Petrucelli's affidavit, Palmer's liability for them turns upon principles of equity.  That question is not free from doubt.  There is no compelling basis upon which to conclude that Palmer knew the representations she made in Schedule B with respect to the Premises' boundaries were not true, and that she made them with the specific intent to mislead the Petrucellis.  The inference I draw from the record is that Palmer relied upon her late husband for the administration of the second home they enjoyed together, and did not know that a corner of the house and the septic system were outside the boundaries of the plot of land she owned. She is liable to the Petrucellis only because Connecticut law takes that harsh view with respect to those who represent that something is true when they do not know if it is.  Nor, I imagine, was Palmer sufficiently schooled in the law to understand the meaning, effect, and potential

consequences of the representations made in her name in Schedule B.  For that understanding, she relied upon the attorney she retained to protect her interests; and *quaere* whether counsel should have agreed to Schedule B as drafted by the Petrucellis' attorney without first making sure that the representations by Palmer contained therein were accurate.

While these factors might incline a court of equity to regard Palmer with sympathy, the equitable case for the Petrucellis is stronger.  They did not make the false representations.  Mrs. Palmer did so — even if, as I will assume, unwittingly — and the Petrucellis relied upon those representations to their cost.  The Petrucellis paid taxes on the Premises because they were listed on the tax rolls as owners of the property: a status they would not have had if Palmer's false representations had not induced them to purchase it.  The case is the same with respect to the other expenses itemized in Margaret Petrucelli's affidavit.  Someone must bear these expenses.  It is more equitable that Palmer bear them, since if she does not, the Petrucellis are out of pocket through no fault of their own and are not returned to the economic position they were in immediately prior to the closing.

Furthermore, most of the Petrucellis' non-legal expenses, such as taxes and reasonable charges for utilities, insurance, and other upkeep, would have been incurred by Palmer if she had retained title to the property.  Those expenditures were effectively an investment in the property itself.  Upon rescission of the contract, Palmer will inherit the benefit of those expenses, and it is only fair that she must pay for that benefit.

As for the Petrucellis' mortgage payments, they were only required because of the protracted struggle that would have been avoided if Palmer had agreed at the outset to the plaintiffs' reasonable demand for rescission.  That demand occurred only one month after the closing and prior to the start

-42-

of any litigation.  Palmer had the perfect chance to recognize her mistake — however innocent — and set things right.  To deny the Petrucellis compensation would effectively reward Palmer for her refusal to take responsibility for her misrepresentations.

The conclusion that the Petrucellis are entitled to recover their mortgage payments is also supported by the Connecticut Supreme Court's holding in *Metcalfe v. Talarski*, 567 A.2d 1148, 1151-53, 213 Conn. 145, 152-55 (Conn. 1989).  In that action for rescission of a contract for the sale of land, the trial court awarded to the plaintiffs the sum total of "interest payments to sellers" that were essentially in lieu of mortgage payments, since the buyers had not yet been able to obtain financing for the purchase.  The trial court held, and the Connecticut Supreme Court affirmed, that these interest payments were not "for use and occupancy of the buildings," and therefore that the plaintiffs were entitled to recover these payments upon rescission of the contract.  *Id.*[17]  The trial court in *Wallenta v. Moscowitz* relied on a similar interpretation of *Metcalfe* to award interest on a loan in that case as well.  *Wallenta v. Moscowitz*, No. CV950052135S, 2002 WL 1009663, *2 (Conn. Super. Ct. Apr. 24, 2002), *aff'd in part and rev'd in part on other grounds*, 839 A.2d at 659-64, 81 Conn. App. at 238-47.  The equities in those cases favored the plaintiffs more strongly, since the sellers had made *knowing* misrepresentations to the buyer — promising to maintain sufficient fire insurance in *Metcalfe*, and falsely averring that no survey of the premises existed in *Wallenta*.

---

[17]     *Metcalfe* also supports the recovery of these fees, if somewhat indirectly, because the Connecticut Supreme Court concluded that the trial court properly granted prejudgment interest to the plaintiffs for the time between their election to rescind the contract and the date of the court's judgment.  567 A.2d at 1155.  The plaintiffs had exercised their statutory right to demand prejudgment interest, pursuant to Conn. Gen. Stat. § 37-3a.  (The Petrucellis have not so elected in this case.)  That statute permitted recovery "as damages for the detention of money *after it becomes due and payable*."  *Id.* (emphasis added).  In other words, the trial court had not abused its discretion in determining that the amounts due to the plaintiffs became "due and payable" on the date that they elected to rescind the contract.

Nevertheless, I conclude that in the present case the equities are still sufficient to entitle the Petrucellis to recover the interest they have paid as a result of Palmer's misrepresentations.

Finally, the limited monetary compensation I award here is not foreclosed by the rule that a party may seek a remedy of rescission or damages, but not both. *Cf. Duksa v. Middletown*, 472 A.2d at 7-8, 192 Conn. at 204-05. That rule prohibits a party from seeking both the *legal* remedy of damages and the *equitable* remedy of rescission. But it does not prohibit parties from seeking to be made whole, in equity, simply because that remedy would demand more than a mere reversal of the properties exchanged in the contract. Connecticut's Appellate Court explicitly recognized the possibility of such outcomes in *Kavarco*:

> There are instances, not applicable here, where the evidence is such that both remedies [of damages and rescission] are available. If, for example, repudiation of the contract requires [] restitution for sums paid prior to rescission [that] are the direct consequence of the fraudulent act of which the plaintiff complains, damages are also recoverable. A defrauded party may affirm the contract and sue for damages, seek rescission and restitution of any consideration paid, or seek rescission and any consequential damages.

478 A.2d at 261 n.4 (citations omitted). *Duksa* is not to the contrary, because in that case the plaintiff had "neither alleged nor proved that he had restored or offered to restore [the defendant] to its former condition as nearly as possible." 472 A.2d at 7 (internal quotation marks, footnote, and citation omitted). Based partly on that failure, and partly on the other circumstances of that case, the Connecticut Supreme Court concluded that "if the plaintiff could have proceeded on rescission, he could not on this record also have had an award based in part on a rescission theory and in part on a 'separate agreement' consequential damage theory." *Id.* at 8-9.

If anything, the Connecticut Supreme Court's conclusion in *Duksa* actually encourages a

monetary adjustment when returning parties to the *status quo ante*.  In that case, the Connecticut Supreme Court instructed the lower court that "[i]n the event that the plaintiff is unable to restore to the [defendant] the [benefit which it received under the contract], an appropriate allowance should be made for this benefit which has been retained by the plaintiff in any award of damages he may receive."  472 A.2d at 9.

### I.     Plaintiffs May Not Recover Attorneys' Fees Arising from this Litigation

Because they have elected to rescind their contract, the Petrucellis are not entitled under the Contract to recover "all costs of said litigation including reasonable attorney's fees,"[18] even though that relief is provided by the plain language of the Contract, in paragraph R of Schedule B.  That is because "[h]e who elects to rescind a contract can claim nothing under it.  A definite election to rescind a contract is final and operates as a waiver of the right to sue in damages."  *Duksa*, 472 A.2d at 7 (collecting cases and treatises) (internal quotation marks and citations omitted); *see also Metcalfe*, 567 A.2d at 1154-55, 213 Conn. at 159 ("[T]he effect of a rescission is to extinguish the contract and to annihilate it so effectively that in contemplation of law it has never had any existence, even for the purpose of being broken." (quoting Am. Jur.; similar language now located at 17A Am. Jur. 2d Contracts § 584 (2008))).  Even though the plaintiffs would need to be reimbursed for these fees in order to be returned to the *status quo ante*, so would Palmer need to recover her attorneys' fees.

---

[18]     But in this action for rescission, plaintiffs are clearly entitled to recover the legal fees that were "incurred during the negotiation and execution of the purchase agreement."  *Metcalfe*, 567 a.2d at 1154, 213 Conn. at 158 (citing *Rabinovitz v. Marcus*, 123 A. 21, 100 Conn. 86 (Conn. 1923)).  It appears that the plaintiffs have claimed those fees separately in their itemization of their expenses and costs, presumably as the "$5,938.75 representing closing costs."  Pls.' Local Rule 56(a)(1) Statement [doc. #27] ¶ 76(a).  As I have already discussed *supra*, plaintiffs are entitled to recover those costs.

Courts in Connecticut have equitably shifted the burden of legal fees in some cases, such as where the defendant committed a fraud that rises to a greater level of culpable deception. *See, e.g.*, *Dockter v. Slowik*, 881 A.2d 479, 485, 91 Conn. App. 448, 455-56 (Conn. App. 2005) (describing a lower court's award of attorneys' fees in a case of rescission, where the defendant knew his misrepresentations to be false, and allowing that outcome to stand without objection in absence of a challenge from defendants); *Wallenta v. Moscowitz*, No. CV950052135S, 2002 WL 1009663, *3 (Conn. Super. Ct. Apr. 24, 2002) (ordering rescission and restitution to plaintiff, including attorneys' fees and costs of litigation, in case where defendant had knowingly made false misrepresentations), *aff'd in part and rev'd in part on other grounds*, 839 A.2d at 659, 81 Conn. App. at 238 (affirming the trial court's order where on appeal defendant "abandoned" his initial claim that "it was improper for the court to award the plaintiff attorney's fees that were in excess of the limit stated in her retainer agreement").  But as I have already discussed, the plaintiffs in this case have not demonstrated at this stage that Palmer's misrepresentations were made with such intent or recklessness as to require compensation for their attorneys' fees.

Furthermore, the Supreme Court has permitted exceptions to the "American Rule" that each party bears its own legal costs only in very limited circumstances: "This default rule can, of course, be overcome by statute.  It can also be overcome by an 'enforceable contract' allocating attorney's fees." *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*  127 S.Ct. 1199, 1203 (2007) (internal quotation marks and citations omitted).  Neither circumstance applies here.

## IV.    Conclusion

Plaintiffs' Motion for Summary Judgment is GRANTED as to Count One, DENIED as to Count Two, GRANTED as to Count Three, GRANTED as to Count Four, and GRANTED as to

Count Five.

Defendant's cross-Motion for Summary Judgment is DENIED in its entirety.

Plaintiffs are entitled to an Order and Judgment of rescission with respect to title to the Premises and the return by defendant to the plaintiffs of the purchase price.

Plaintiffs are also entitled to a Judgment for the monetary amounts they claim, with the exception of attorneys' fees and legal expenses incurred in connection with the filing and litigation of this action.

Counsel for plaintiffs are directed to settle an Order and Judgment consistent with this Opinion on ten (10) calendar days' notice.

**It is SO ORDERED.**

Dated: New Haven, Connecticut
      January 9, 2009

                          ___/s/ Charles S. Haight, Jr._____
                          Charles S. Haight, Jr.
                          Senior United States District Judge

**V.      Document Appendix**

The Contract states, in relevant part:

> CONTRACT OF SALE, made this 6th day of September . . .
>
> Witnesseth, that the Seller agrees to sell and convey, and the buyer agrees to purchase all that certain real property[*] located in the Town of New Fairfield, County of Fairfield and State of Connecticut, being described on Schedule A, attached hereto and made a part hereof.

Contract of Sale, Pls.' Local Rule 56(a)(1) Statement, Ex. Q. [doc. #27-19] at 1.  The paragraph is immediately followed by a typed addition: " *commonly known as 9 Lakeshore Drive North, New Fairfield, CT."  *Id.*  The second page of the contract contains both a disclaimer of representations and incorporates the affirmative representations made in Schedule B:

> 5.      CONDITION OF PREMISES.
>
> (a)      The buyer has inspected the premises, and any buildings, systems, fixtures and appliances located thereon, or has caused an inspection thereof to be made on his behalf, and the Buyer is fully satisfied with the physical condition thereof.*
>
> (b)      Neither the Seller, nor any representative of the Seller, has made any representation upon which the Buyer relies as to the make, quality, value, condition or other matter relating to the premises or any building, system, fixture, or appliance located thereon, except as herein expressly set forth.

*Id.* at 2.  The asterisk following paragraph 5(a) corresponds to a footnote on the same page, which states:

> * Schedule B consisting of three (3) pages is attached hereto and incorporated herein by reference.

*Id.*

Schedule A, incorporated by reference, describes in relevant part:

-48-

ALL that certain lot, piece or parcel of land, with the buildings thereon, situate, lying and being in the Town of New Fairfield, County of Fairfield and State of Connecticut, known and designated as Lot No. Four (4), Section "E", on a certain map entitled Amended Map of Lots #1-2-3-4, Section "E" and filed in the Office of the Town Clerk of the Town of New Fairfield, on the First day of August, 1929.

*Id.* at 6.

Schedule B, incorporated by reference as described above, begins as follows, and states in relevant part:

Seller has no reasonable cause to doubt the accuracy of and hereby represents, in order to induce Buyer to enter into this Contract, that at the time of the signing of this Contract and at the time of closing of title the following statements are accurate:

. . .

D.     Any buildings, appurtenances, systems and driveways servicing said Premises are entirely within the boundary lines of said Premises. . . .

. . .

K.     The water system and septic system serving the Premises being conveyed herein have been properly installed, in accordance with all state and municipal regulations, and are adequate and sufficient to serve the Premises.  The Seller represents that the Premises are serviced by a septic tank and leaching fields located entirely within the lot lines of the Premises, that the tank and fields serve no other Premises. . . .

. . .

R.     In the event of litigation regarding any issue arising out of this contract or transaction, the prevailing party in said litigation shall be entitled to recover, in addition to any other damages awarded, all costs of said litigation including reasonable attorney's fees.

-49-

*Id.* at 13-14.

The "Title Affidavit" signed by Palmer states, in relevant part, that "I/we have allowed no encroachments on the premises above described by any adjoining land owners nor have encroached upon any property of adjoining land owners."  Ex. T [doc. #27-22] at 2.

Finally, the "Statutory Warranty Deed" signed by Palmer grants to the Petrucellis, the property described on "Schedule A, Description, attached."  Ex. U [doc. #27-23] at 2.  That description is the same schedule that was annexed to the Contract, which incorporates by reference the map that was available on file at the Office of the Town Clerk.